Okay. Thank you. So we turn to the next case on our docket, which is Natural Resources Defense Council v. Scott de la Vega. And for the appellants, we have Barbara Chisholm, and for the appellees, Kaitlin Schmidt. I apologize if I've mispronounced anybody, but we'll proceed. Case is set for 20 minutes per side. Good morning, Your Honors. May it please the Court, Barbara Chisholm on behalf of NRDC and the other plaintiff appellants. I would like to reserve seven minutes for rebuttal, and I will watch the clock. Plaintiffs ask this Court to apply well-established standards under the Administrative Procedures Act and the Endangered Species Act, and to hold that of multi-decade water contracts was arbitrary and capricious and contrary to law, and that reclamation's reliance on that consultation was unreasonable. And further, to allow plaintiffs to proceed with their claim that reclamation was required to reinitiate consultation regarding the ongoing agency actions implementing the Sacramento River settlement contracts. Now there's a lot of briefing before this Court, as I'm sure you are all aware, and I want to focus the Court's attention on three points with respect to the 2015 consultation, and then turn to the erroneous dismissal of plaintiffs' reinitiation claim. So with respect to the 2015 consultation, following remand from this Court and after a stay of district court proceedings so that reclamation could engage in a consultation on the effects on issued a letter of concurrence agreeing with reclamation that executing these new contracts would not have adverse impacts on Delta smelt. Now this concurrence failed to meet the most basic requirements for an ESA consultation. First, Fish and Wildlife, in relying exclusively on the 2008 biological opinion in its 2015 letter, violated the statutory requirement that it, quote, use the best scientific and commercial data available. Second, in relying on the long-term operations 2008 biological opinion, Fish and Wildlife took no note of that opinion's jeopardy finding and that it had required an alternative federal action, known as the RPA or the Reasonable Prudent Action. Thus, in failing to address how the contracts complied or did not allow compliance with the RPA, it ignored and failed to address a major question. And then third, in relying exclusively again on the 2008 biological opinion, Fish and Wildlife failed to analyze 15 years of effects of the federal action before it was considered for purposes of the Sacramento River Settlement Contractors. I will note that the 2015 consultation also presents well-trodden questions of reclamation's discretion at the time of contract renewal. Many of those questions were resolved by this court in Juul. Turning to the dismissal of reinitiation of consultation claim, briefly I want to say the District Court's dismissal of plaintiff's claim regarding that reinitiation of consultation on the Sacramento River Settlement Contracts also turns on this question of discretion. In short, defendants want to have their cake and eat it too. They argue with respect to the 2015 concurrence that there's no need for Fish and Wildlife to have consulted on the terms of the renewal because the contracts themselves require compliance with the ESA and that reclamation can modify its operations to comport with the ESA. However, on the reinitiation claim, defendants now argue that reclamation has no discretion at all with respect to operations. And in implementing these renewed contracts, can't take any action that could be exercised for the benefit of the smelt. The briefing identifies multiple sources of discretion in reclamation's implementation of the contracts. I want to highlight three, all of which are made clear in the terms of the contracts themselves. Reclamation can, as it has previously conceded, short or not release water to meet project water amounts. Now this is discretion that can inert the smelt, excuse me, of the Chinook salmon, also to the smelt, but the issue here is the Chinook salmon. By retaining... Excuse me. Yes, Your Honor. Would you have a moment, just when you're going through these items, explain which section of the contract you're referring to? That would be helpful for me. Yes, Your Honor. So turning, and right now I'm talking about the reinitiation of consultation claims. So the failure, in light of new evidence before the agency in 2015, the failure of the agency to reinitiate consultation regarding the effects on Chinook salmon, given the two years of near mortality of Chinook salmon. So as I said, there are a number of provisions in the contract that grant ongoing discretion to reclamation to operate the project. To inert to the benefit of the Chinook salmon. The two shortage provisions I will highlight are written as no liability provisions, and defendants make much of this in their briefing. But at base, this is actually an issue that was decided or is governed by JUUL. So what are those articles? If you could just... I'm sorry, that was too long of a lead in. I'm looking at Article 3i and also Article 3h, Your Honor. Okay, thank you. So Article 3i is the specific shortage provision for project water, and Article 3h is a general shortage provision. Both of which, as I was saying, are framed as no liability provisions. But in JUUL, this court described the concern with discretion and said that no liability provisions leave reclamation free to exercise discretion to take action to protect listed species. Therefore, although defendants make much of the way that these two shortage provisions are worded, in fact, they make clear that reclamation faces no liability should it need to short the contracts in order to comply with ESA provisions. The project water provision is the most clear. It says that reclamation has broad discretion with respect to project water, which, as Your Honors may understand already from the briefing, although it is voluminous, the Sacramento River settlement contracts have both a base supply and project water. The base supply is taken as the compromise amount of the senior water rights. The project water is treated more like the water under other water service contracts and can be zeroed out. Now federal defendants previously told this court, quote, reclamation can reduce project water under Article 3i of the SRS contracts to comply with the ESA, end quote. And, quote, should it ever prove necessary for project water under the SRS contracts to be reduced to meet legal obligations under the ESA to benefit the delta smelt or other listed species, Article 3i gives reclamation the same ability to do so as it has under the DMC contracts. So what, my question was, what legal obligations are you referring to in this context? So the legal obligations here that might warrant reducing releases of project water would be the ESA. Under the ESA, reclamation has an obligation to provide sufficient cold water rearing habitat for juvenile Chinook salmon species. So that legal obligation might well mean that the reclamation should not release project water and should instead store it to ensure that... So is that a free-floating obligation or are you talking about compliance with the biological opinion in the RPAs? Or are you talking about some other specific legal obligation, statutory legal obligation? And if so, could you cite the statute? No, Your Honor, I'm talking about complying with the ESA. The question here for the court is on this motion to dismiss whether there was one, ongoing federal involvement in the action, which there is, because reclamation has to release the water to comply. And two, whether there was information that suggested that there was a need to reinitiate consultation. And then for this court, whether there is, in a reinitiated consultation, enough discretion for the agency to actually act for the benefit of the smelt. Excuse me, I keep doing that for the Chinook salmon. Yes. So, Your Honor, yes, it's the ESA, but under a reinitiated consultation, the agencies would be looking at whether compliance with the current biological opinion RPA is sufficient to avoid jeopardy or not. The operations... So, that doesn't say that you have to reinitiate consultation, I guess. That seems a little circular. So, the reinitiation of consultation would have to take place if there was new information and they have the discretion to make a change. But they only have discretion to make a change if that's in the contract. The contract here just says to meet legal obligations. Of course, the ESA requires it merely to go through a process. So, I'm having... I'm confused about how you think that the ability to meet legal obligations gives it discretion to make unilateral changes. It's not a question of unilateral change, Your Honor. It's a question of whether they have discretion to comply with the ESA. And defendant's argument, frankly, seems a bit circular to me, which is that the ESA is a mandate, and therefore, the discretion that we reserve as reclamation, and which reclamation has admitted previously to this court, that it could reduce project water if it needed to do so to protect listed species, that that's somehow not sufficient enough to warrant reinitiation. Well, if there was a new biological opinion, let's say there is a change in the CBP operations and their biological opinion makes certain changes to what reclamation could do. I suppose Article 3i would then allow it to meet those legal obligations in a new biological opinion without... But I don't see how that gives them discretion on their own to make any change. Am I misunderstanding that? I guess, Your Honor, I would say the issue here is whether there's any other legal obligation that makes it impossible for the agency to exercise discretion for the protected species. That's what Jewell says. Oh, it's the contract, right? Sorry, Your Honor, I didn't mean to interrupt. The contract itself says you may short this water if necessary for legal obligations. So then the question is, is the current ESA biological opinion sufficient to meet reclamation's legal obligations under the ESA? So under the ESA... This is their legal obligation, right? Excuse me? Complying with the biological opinion is their current legal obligation. Well, they have an obligation to comply with that. They also have an obligation under 50 CFR 402.16 to reinitiate consultation under certain circumstances. Which includes where there's new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered. Now here you have information before the agency in 2014 and 2015 that the releases to satisfy the SRS or the Sacramento River Settlement Contracts depleted the cold water pool. So much so that it caused incredibly high temperatures in the Sacramento River and resulted in near total mortality of two years of juvenile Chinook salmon. That warrants under the governing regulation reinitiation of consultation. To hold otherwise would be to be at odds with the entire purpose of the ESA, which is to allow to protect the continued existence. If you could say anytime you have a biological opinion and information comes to light before the agency that suggests it's not sufficient, that you don't have an obligation to reopen, that would be at odds with both the statute and the regulation here. If there are not other questions, I think I'll reserve the rest of my time for rebuttal. Thank you. Okay, no questions here. Thank you. Okay, thanks. Okay, so next we'll hear from Ms. Schmidt for appellees. Good morning, Your Honors. And may it please the Court. Caitlin Shugart Schmidt here on behalf of the federal appellees. My goal is to take 12 minutes this morning, reserving four each for each of the intervenors' counsel. So you have a chance to hear from all perspectives, but I'll do my best to watch the clock. Your Honors, this Court has called the Central Valley Project the most complex federally-managed water project in the country, and yet every single drop of water in this massive system has been analyzed and accounted for by the federal agencies time and again. In addition, every aspect of this project has been litigated extensively over the past 20 years, including through multiple visits to this Court. In this specific case, the last time we were here, this Court directed that the Bureau of Reclamation retained enough discretion within the context of the contract renewals to mandate consultation under the Endangered Species Act. The Bureau of Reclamation followed that command in 2015 when it consulted on the contract renewals. Plaintiffs remain dissatisfied with the outcome of that consultation process, and they are entitled to want to live in a world where we have different contracts than the ones that we have. But as a practical matter, here the federal agencies have done their work as required under the law, and the holdings of the District Court in accordance with that should be affirmed. Unless you have specific questions otherwise, I will start with the sort of fifth claim related to the discretion inherent within the contract with regard to the salmon, but then I'm also happy to turn to issues regarding the Delta smelt. So I want to start by saying I think, Judge Aikuta, you landed on exactly the right point here, which is there's this sort of weird horse and cart situation being put forward by the plaintiffs here. We have provisions of a contract that deal with things that might happen if there is a legal obligation, but the only legal obligations that plaintiffs point to in this context are either somehow the ESA as a whole or the idea that if new information is presented that you have to do something. But you only have the ability to do something if there is discretion. But you'd concede that the first point was triggered, the decline in the smelt in 14 and 15, or the chinook in 14 and 15. Well, I don't think that that is relevant here because we don't reach the question, we don't have to reach the question of whether new information is presented that would require the agency to do anything unless the agency has discretion to do something. Isn't it the other way around logically? If there's no cause for reconsideration, you don't get to the second point, whether you've got discretion to carry it out. But it seems to me that the first point, the circumstance that would require re-initiation is clearly on the record. Well, I suppose, Your Honor, our approach here is, or our perception here is that the ESA only mandates re-initiation of consultation if two things are true. First of all, the first thing that has to be true is there has to be discretion to do something. Why is it the first thing? If there's never a triggering event such as the decline in the chinook, we wouldn't be here. I mean, I don't think we'd have any objection to you holding that way, Your Honor. But I think when it comes down to it, regardless of which way you look at it, the underlying point from our perspective is there is not discretion within these contract provisions as exists today that would permit any sort of material change in reaction to new information or not. And the agency can always elect to re-initiate consultation, but the question is whether it has a legal mandate to do so in the face of any of a variety of factors. And I just want to emphasize here that the provisions that are talked about a lot really appear sort of standard contract provisions, right? I mean, just as when we were in this court last time, there was discussion over the idea of a standard incorporation clause in a contract. Here we're talking about provisions that deal with relief in the case of a breach. And I don't think that this court wants to set any standard that says you can have a provision in a contract that deals with what might happen after a breach, and that in itself is an invitation to breach the contract. It deals with the consequence, not with whether there's authority to do that breach in the first place. I think that's true with respect to 3I and 3H, and I'd also say with regard to 7B, there's certainly some area of disagreement between interveners and the federal agencies in terms of the specific contours of what might happen in the future should there be some buy-off that required action that couldn't be taken underneath the existing contracts. But that is not something that has happened. It is not the case today that we have any situation where there is a legal obligation, which could be something like, you know, it's hard to know because it's theoretical, but it could be something like a future buy-off that concluded that it wasn't possible to move forward with the contracts unless there was some dramatic change. Then maybe we look and we have to figure out exactly what the contours of 7B mean. But we don't have to today because there's been no circumstance in which we have that sort of negative finding. Right now what we have is a buy-off that says, you know, with these reasonable and prudent alternatives in place, the contracts as executed can, you know, not cause jeopardy to the species, and that is sort of the underlying goal. And as long as that's the case, the agency lacks discretion to make any changes to the contract. If your honors don't have any further questions specific to the salmon, I guess I will just note sort of generally too with regard to the ESA consultation that is appropriate here in general that I just want to make sure it's clear that when we're talking about the Endangered Species Act, we're not talking about a statute like NEPA. We're not talking about a statute in which the goal is sort of information gathering or the goal is to check procedural boxes. The goal under the ESA is substantive. The goal is to bleach an outcome, which is a no-jeopardy conclusion for a species. And so regardless to the degree of which Reclamation made a practical choice about contract terms or scoping its project action or felt it was constrained or anything else, at the end of the day, the goal of the ESA is that an action agency proposes a project, and that project is evaluated by the Fish and Wildlife Service or the other wildlife agency to determine if it can move forward without causing jeopardy. And as long as that's the case, that's really the end of the goal of the ESA. And I wouldn't want this court to impose this sort of additional mandate on any wildlife agency that it consider all of these options for things that an agency might do beyond the scope of the requested project because we're already talking about work that is extensive. I think the 2008 buyout when it was litigated in this case was called by this court the most complicated buyout that had ever been done. These are already massive undertakings, and there shouldn't be any obligation to consider options beyond what the action agency's project is as long as you can reach that outcome and still have a no-jeopardy finding. If your honors have no further questions with regard to any of these particular aspects for me, I'm happy to ensure that we have time to hear from the interviewers as well. Yep. I have no questions. Good morning. May it please the court. My name is Meredith Nickel, and I'm here on behalf of the Sacramento River Settlement Contractors. The Sacramento River Settlement Contracts are just that. They're settlement contracts. They're agreements resolving the claims of the parties that have put Sacramento River water to beneficial use since prior to the construction and operation of Shasta Dam and the Central Valley Project. The settlement contracts avoided what would have been a decades-long adjudication of every water right on the Sacramento River and ultimately allowed for Reclamation to obtain the water rights it needed to operate the Central Valley Project. Unlike Reclamation's other water rights, excuse me, other water contracts, the settlement contracts' evergreen provisions setting the quantities of water to be furnished to the settlement contracts are the foundation upon which the Central Valley Project can be reliably operated for flood control, for water supply, for habitat and power throughout the state. The quantities of water that are set by the contracts are divided into two quantities that you heard the appellant's attorney refer to as basin project water. However, the quantities themselves are confirmed and guaranteed by the contracts.  The basin project water supplies are not like any other contracts and project water, the only difference with project water and base water is that project water is water that the settlement contractors pay for. They pay Reclamation for that water. After this court's en banc review in 2014 and a thorough and exhaustive analysis by the district court in three very lengthy decisions, appellants are back here asking this court to upend the settlements and the mutual agreements that were reached in the settlement contracts. That request would lead to only more lawsuits while the settlement contractors divert as they did before the construction of Shasta Dam based on their senior water rights. There are three simple reasons that I want to go over for why this court should decline the appellant's request. First, as was directed by this court in RDC v. Jewell, Reclamation consulted with Fish and Wildlife Service on the executed settlement contracts. In compliance with the Endangered Species Act, the agencies analyzed the diversion of the full quantities of water that would be diverted under the settlement contracts. The agencies properly determined that together with the overall operation of the Central Valley Project, that diversion of water would not jeopardize the continued existence of Delta Smelt. Is analyzing the total flow over the contract the same as looking at specific periods, which is the NRDC's criticism that you didn't look at 25 or 30 years out rather than 40? Does that wholly answer their objection? There's two answers to that concern. First is that the ESA requires that the agencies analyze the whole of the action. Here, the action at issue in executing the renewal contracts is signing a contract. Reclamation exercising its discretion to sign a contract. That action, however, is taken in the context of overall project operations. As the district court described, there's two consultation structures that are separate but parallel. So you have one consultation on the execution of the contract that relies on the overall operation of the project. The overall operation of the project in the course of that consultation, which was upheld by this court, that consultation looked at the best available science and technical information that was available and relied on a computer model to analyze the projected operation of the overall operation of the project together with the full quantities of water. And based on that information resulted in a biological opinion that was upheld by this court. The full contract quantities were analyzed in that respect together with operations. And you really can't analyze the contract quantities and delivery of water outside of the context of the overall project because they're part of the same thing. The specific execution consultation also included an analysis of the specific use of the water on the land and within the service areas of the various contractors. So together, the two consultations considered the whole of the action. The second reason why this court should uphold the district court's opinions is that even if reclamation were to renegotiate the settlement contracts, although it was not required to do so by the en banc ruling in NRDC v. Jewell, reclamation would need to conduct that renegotiation in accordance with a complicated set of federal and state laws that the en banc court did not reach. It also must reach mutual agreement with the settlement contractors, and no such renegotiation has already occurred. The third reason to affirm the district court relates to the reinitiation claim. And here it's, I think, important to start to answer Judge Salna's question about how the standard applies, to remember that the standard that applies is the same standard when you're looking at a new action, like initiating or renewing a contract, or during the consultation process, and it comes from the Endangered Species Act itself. Section 7 only applies where there's discretionary involvement or control that can inure to the benefit of the species. So the ESA standard itself has to apply before you get to the triggers for reinitiation, which are in the implementing regulations. So here the appellants cannot state a claim for reclamation to reinitiate consultation because they cannot get past that threshold application of the standard of the Endangered Species Act. During the term of the executed settlement contracts, there are no provisions, as was very carefully detailed by the district court's ruling on this, that any term of the contracts would allow reclamation to unilaterally amend their terms to benefit salmon. In particular, with respect to Article 3i that Judge Ikuda was asking about, the en banc court did not hold that Article 3i affords reclamation any discretion. In fact, it didn't cite to Article 3i at all. And there's clear authority in Sierra Club v. Babbitt and the Epic case that hold that in the context of a previously issued permit or a preexisting contract or agreement, the standard that applies is that the government agency must be able to take action that would affect private action, but that is not what we have here under these settlement contracts. And as my colleague for the federal government very effectively argued, there are no biological opinions that currently require any changes to the settlement contracts terms, and so it would be premature to speculate about what the effect of such a biological opinion might be. It is now time for the courts to allow reclamation to continue the important multipurpose management of the Sacramento River without this nearly two decades long ongoing cloud of litigation. The settlement contractors ask that this court affirm the district court's rulings. And with that, I'll turn it over to my colleague, Dan O'Hanlon. Good afternoon. May it please the court, my name is Daniel O'Hanlon. I'm appearing today on behalf of the Delta-Mendota Canal group of contractors. We refer to them in the briefs as the DMC contractors. These are contractors who serve primarily agricultural lands located south of the Sacramento-San Joaquin River's delta in the San Joaquin Valley. I'd like to address a point today that has not yet come up in the argument, and that is the issue of mootness. As we argued in our answering brief and explained, that 12 of the 13 DMC contracts challenged in this litigation have been superseded with new contracts. That occurred in 2020 and in 2021. In their reply brief, the plaintiffs have argued that the court, notwithstanding that the contracts they challenged have been superseded, the court can award relief against the new contracts, and that therefore the case is not moot. That argument fails for a number of reasons. First, the plaintiffs argue that the new contracts are nearly identical to the old contracts. That's not correct. First, these are different types of contracts under reclamation law. The new contracts are what are known as repayment contracts. The former contracts are what are known as water service contracts. We cited a case in our brief, the Grant County Black Sands Irrigation District case, a decision from the Federal Circuit that details the differences between those two types of contracts under reclamation law. Secondly... I may have missed this in the briefing, but did reclamation go through the Section 7 process, consultation, the like, before it entered into the new water service contracts? No, no, it did not. And it did not... Sorry, it did not because these contracts were converted under the provisions of a law known as the Water Infrastructure Improvement for the Nation Act, or the WIN Act, Section 4011 of that act. And that act specifically provides that upon request from the contractor, the secretary is directed to convert the contract from a water service contract to a repayment contract. And reclamation concluded that terms of that statute left it very little discretion to alter the terms of those contracts in any way that would inure to the benefit of listed species. And therefore, reclamation did not consult under ESA Section 7 regarding that conversion under the WIN Act. Does that support the argument that there may be a continuation of the old contracts? No, Your Honor. To the contrary, I think that that fact distinguishes these contracts. And essentially, in the WIN Act, Congress directed that these contracts, which were at the time existing contracts as the statute required, that those could be converted and gave specific direction as to the terms of the conversion. So that actually, in essence, distinguishes these contracts from the old contracts. Opposing counsel argues that if the old contracts were invalid, then the new contract would also be invalid because it merely converts the old one to a new one. I'm sorry, Your Honor, I didn't hear what may have been the last part of your question. I'm sorry. The opposing counsel argues that if the old water service contract was invalid, that would make the new, the converted water service contract also invalid since it was just a statutory conversion. And I wanted your response. We disagree with that, Your Honor. At the time that the statute provides, and this is Section 4011A, that the Secretary is directed to convert any contract, quote, in effect on the date of enactment of the sub-tile. And all of these contracts that were converted were in effect. There's nothing else that the statute required. At the time these contracts were in effect, they were valid. Their government agency actions presumed to be valid until there's been a determination otherwise. And at the time these contracts, and still today, were converted, they were valid existing contracts. The final point I would make, Your Honor, with respect to the issue of mootness, is that, again, there are very different terms. There are different terms as to the length of the contract. There are different terms regarding payment obligations and specifically provisions that if the remaining construction contract, construction costs are repaid, that the contractor is relieved of various other obligations that would apply under a reclamation law. And, again, this is all pursuant to the direction of Congress in the Winn Act. Those are the final points I wanted to make regarding mootness. I'd be happy to address any further questions the Court has. Counsel, Judge Gould, I've got a question for you. On your mootness issue, did the validity of the new contracts depend in any way on whether the old contracts were valid under law? No, Your Honor. I submit they did not. What the statute requires is that they be in effect at the time of enactment of the title in order to qualify for conversion, and that condition was met. And I would observe also that even assuming plaintiffs had prevailed on their claims under Section 7 regarding these contracts, that does not automatically require that the contracts be invalidated. That would be a remedy question that would have to be addressed. It's not an automatic consequence of an inadequate consultation. Thank you. Thank you. I want to address a few points in rebuttal. I want to start with Judge Selna's question about the full federal action here and the failure of Fish and Wildlife to evaluate 15 years of effects of the federal action that reclamation was entering into. Now, defendants argue both today and in their papers that this Court should adopt a new standard that looks to whether the assessment of a portion of a federal action was, quote-unquote, meaningful. That cannot be the standard. Two problems with it. First, the statutory obligation on its face is clear that the agency must evaluate the full federal action that's discussed in Connor v. Beaufort. And second, in this case, the agency offered no explanation whatsoever as to why it was ignoring 15 years of the federal action. So that would mean that this Court would be taking on the role of expert to determine whether the partial consultation was or was not meaningful. That certainly cannot be the law, and the Court should not be put in that position. Now, the Sacramento River Settlement contractors argue that there's an explanation in the long-term operations biological opinion about why that opinion only goes through 2030. That may be the case, but there is nothing in the letter of concurrence by Fish and Wildlife that says, we think that's appropriate. We think that based on the biological opinion and that it only went through 2030, we therefore don't think that 15 years of contract effects are worth our while to investigate and makes no adverse impact finding based on that. Now, this Court's decision in Pacific Coast Federation v. Bureau of Reclamation warns against the Court engaging in implicit reasoning, and I recommend that decision to the Court. It says the Court can't put itself of guessing at what might or may not have been implied in an agency's decision-making process. And I think that is what the defendants are inviting you to do here. Second, I want to make a quick point on the failure of the agency of Fish and Wildlife in the 2015 consultation to rely on the best available data and to use it, use being the statutory word. There was 2014 and 2015 fish survey results. There was the 2015 mass study, which if you look at the record, Fish and Wildlife had acknowledged as being the best available science and creating uncertainty as to the analysis in the current pending biological opinion. The decision of Fish and Wildlife to bind itself to an analysis that ended in 2008 is arbitrary and capricious. Turning to the reinitiation claim, the standard here is not whether Reclamation retained the ability to change the contract terms. That is not what the federal regulation states. It's not what the precedents of this Court state. One issue that is addressed in Cottonwood is exactly this question, which is whether when the Forest Service there remained involved in forest plans and made decisions after the approval of the forest plan, was that sufficient discretion? And it was. Here, Reclamation makes decisions on a daily basis, definitely on an annual basis, to implement the current operations and the contracts. That ongoing discretion is sufficient to trigger reinitiation of consultation. The concern at base here is that Reclamation is, on the one hand, saying it had no discretion to renew the contracts on different terms or limited, and also representing to the wildlife agencies, to this Court, that it does retain discretion to the extent that there is evidence of jeopardy, that it retains discretion to make changes. Now, you've heard opposing counsel here today say, at some point there will be another biological opinion, and yet in the same argument they are decrying any sort of discretion to engage in that new consultation. Biological opinion here is being used to refer to the long-term operations biological opinion, but there should have and could have been a biological opinion on renewal of the contracts. There also could be a biological opinion that comes out of reinitiation of consultation. So when Reclamation asked for the consultation, excuse me, asked for the letter of concurrence, what it told the agency there is actually instructive  There it said, if information comes to light that makes it clear that we're not able to adequately protect the delta smelt, at that point Article 7b kicks in and we will be able to do something. So they're saying that with respect to the consultation on the renewed contracts, when it's time to reinitiate consultation with the National Marine Fisheries Service for the Chinook salmon, they say no, actually we don't have that consultation that we told you, we told the other agency that we had. That can't be the case. On mootness, two quick points. The NRDC versus Los Angeles County case that we cite in our papers, I think is instructive on this. There the agency, there was a permit, the permits changed over time. The court said that when you have sort of ongoing changes but they underline similar or same provisions, the issue is not moot. Additionally, so long as there is relief that can be awarded, and we've explained how there is relief here that could be awarded, which is a consultation on the renewed terms and on the terms of those contracts, certainly the issue is not moot. I see that I'm over my time, so if there are no further questions, I will submit, but I'm happy to answer further questions. I have one question. If the law requires the agency to consider the entire case, then what's the significance of the fact they considered a shorter term than the actual contract term? Your Honor, I think by considering and essentially chopping off 15 years of 40 years of federal action, the agency is, one, it's arbitrary and capricious because it doesn't consider the full effects, but those additional 15 years could well have had an impact. Now, it's not obviously NRDC's or this court's place to say what analyzing those additional 15 years would have shown, but certainly with ongoing climate change, with increasing drought levels, one could imagine that assessing the last 15 years of the federal action might change the analysis of the wildlife agencies. And there are tools available to do that? I'm sorry, I didn't catch the first few words. There are tools available to analyze impacts of 35 years to 45 years or available for that sort of analysis that you have available. So this court has said that if the reasoning is that the scientific improbability or uncertainty is the reason for not analyzing the future effects of a contract, then the agency needs to say that. The agency hasn't said that here. Are you aware of those tools? That was my question. Am I aware of those tools? I think that there are tools, certainly now, given that we are many years into the contract. I think it would be possible to analyze it through 2045. But that, again, is not really the role either of plaintiffs or of this court to say what is and is not possible. The question here is that the agency itself gave no explanation as to why it was reasonable to not consider 15 years of action. They used a computer model that went out 35 years. Did they say they didn't consider the whole of the action, or is it just based on their computer modeling? Your Honor, I'm guessing a little bit at your question, but I think I heard it. The 2008 biological opinion does rely on computer modeling. That's the biological opinion for the overall project. The concurrence, and I do advise taking another look at the actual concurrence, it has no reference whatsoever to computer modeling, to anything. It just says all of the effects were considered in 2008 and were done. Thank you. If there's nothing further, I will sit down. I have no question. How about Judge Selma? No, thank you. Thank you. Thank you. Thank you. This challenging case will now be submitted, and the parties will hear from the panel in due course. I want to thank counsel on both sides of the case and counsel for the interveners for their advocacy, which is a very big help to our panel in sorting out the issues for decision. Therefore, that case is submitted. National Research Defense Council 2115163 is now submitted, and the court will adjourn. An NSARC docket for the day in the court will now adjourn. All rise.
judges: GOULD, IKUTA, Selna